**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | 08 CR 948 |
| v. ) | |
| ) | |
| ARCHIE STALLWORTH ) | |

### MEMORANDUM OPINION AND ORDER

The court has under advisement a motion by the defendant Archie Stallworth for a new trial based on newly-discovered evidence and additional related grounds. Stallworth is a former police officer of the City of Harvey, Illinois. He was convicted in September 2009 on a two-count indictment charging him with an attempt to possess, with intent to distribute, a quantity of cocaine, and, in a second count, with falsifying a Harvey Police Department report with intent to impede an FBI investigation. He was convicted on both counts and sentenced to twelve years' imprisonment. The convictions were affirmed, United States v. Stallworth, 656 F.3d 721 (7th Cir. 2011).

The case arose out of an FBI investigation of the Harvey Police Department, using undercover agent Carlos Vargas, who posed as a drug dealer. Vargas enlisted Stallworth to provide "protection" for a drug transaction. The facts concerning the drug charge are summarized in the Court of Appeals's opinion:

> The fateful day arrived on August 11, 2008. Vargas called Stallworth, offering to pay him $1,000 to help with a job that involved picking up a drug shipment at the DuPage Airport. Stallworth agreed, and the two rendezvoused at Vargas's apartment. At Vargas's insistence, he was and remained armed throughout the operation. Vargas and Stallworth drove in separate cars to the airport. There they met a man who had three duffel bags purportedly containing 30 kilograms of cocaine. Vargas and Stallworth moved the three bags into Vargas's car. Vargas then opened the bags and showed Stallworth, over the latter's protest that he did not want to view the contents, powder appearing to be cocaine. (In fact, it was fake.) They both then drove, again separately, to a Target parking lot. At the exchange point, Vargas made a call to another undercover agent who came and picked up the drugs. Vargas paid Stallworth the agreed $1,000, and they went their separate ways.

656 F.3d at 724-25.

The events leading to the charge of filing of a false police report began two months later, with an FBI interview of the defendant:

> In mid-November 2008, two FBI agents followed up with Stallworth about the August 11 transaction. Initially, they spoke to him at the Metra police offices in Chicago. Stallworth admitted that he had accompanied Vargas for the transaction but he denied knowing what was in the bags. He asked at that point to speak to his attorneys, while agreeing to reconvene shortly at the U.S. Attorney's office in Chicago. Once there, the FBI agents confronted Stallworth with all the evidence against him. Stallworth broke down, stating that he was not a dirty cop, but that he had "screwed up."

Id. at 725.

Stallworth's partner was Officer Andre Sneed, who had also been approached by Vargas about providing protection for drug deals. Sneed had prepared a brief report of the matter, which was

on file in the Harvey Police Department when Stallworth was interviewed by the FBI in November.  The report did not mention Vargas by name, nor was there any mention of Stallworth being involved in whatever investigation Sneed indicated he was conducting.

The evidence at trial showed that sometime after the FBI interview, Stallworth prepared two additional pages, describing his activities at the DuPage Airport as being part of a joint sting operation with Sneed, and attached them with a paperclip to Sneed's report.  Stallworth also put ten $100 bills in an envelope and placed the envelope in his personal safe at the Police Department.

Prior to trial, Stallworth subpoenaed the Harvey Police Department to produce the Sneed report, which, along with Stallworth's additional two pages, was received in evidence at trial.

Stallworth did not testify, but his counsel argued that the report showed that his client had no intent to facilitate a drug transaction but instead was conducting a legitimate law enforcement activity.

## **THE PRESENT MOTION**

The defendant's motion for a new trial based on newly-discovered evidence requires a showing that the evidence

> (1) was discovered after trial; (2) could not have been discovered sooner with due diligence; (3) was material and not simply impeaching or cumulative; and (4) if

    presented at a new trial would probably result in acquittal.

United States v. Reyes, 542 F.3d 588, 595 (7th Cir. 2008)(internal quotation marks omitted).

    The evidence Stallworth claims to be newly discovered is contained in a civil complaint filed in this court by Andre Sneed on November 28, 2011. Stallworth received a copy of the complaint at his place of imprisonment on December 1, 2011. In the complaint, Sneed (who is still employed as a Harvey police officer) charges the City and a number of its officials and police personnel with a long list of unlawful acts that have allegedly infringed his First Amendment rights. What Stallworth claims to be newly-discovered evidence entitling him to a new trial is Sneed's allegation that Acting Police Chief Denard Eaves, although knowing that Stallworth had participated in the investigation of Vargas, threatened Sneed with termination or suspension should he testify on Stallworth's behalf at the trial.[1]

## DISCUSSION

    We begin with the question of whether the allegation in Sneed's civil complaint can be regarded as evidence that was discovered only after trial and could not have been discovered

---

[1] "[W]hat the defendant **did not know** was that Andre Sneed was **threatened** by the government's witness Acting Police Chief Denard Eaves, and became fearful and could not exercise free speech, for fear of retaliation resulting in termination or suspension. Therefore, resulting in defendant's witness Andre Sneed not showing to testify due to the threat made by Acting Police Chief Denard Eaves (who is also a government witness in this case)." (Def.'s Reply, "Argument" section, at 2.)

before trial with due diligence. Stallworth's relationship with Sneed is important here. They were partners in their police work and friends for many years. Stallworth was released on bond on November 27, 2008, almost ten months before the commencement of his trial on September 21, 2009. Considering the grievances detailed in Sneed's voluminous civil complaint, it seems quite likely that he would have talked with his friend Stallworth about their respective problems, and probably on many occasions, during this ten-month period. The question of Sneed's testifying for Stallworth must have come up, as evidenced by the fact that Stallworth listed Sneed as No. 1 on his witness list. Assuming that Sneed's allegation about Eaves's threat is true, then, in order to find that Stallworth did not know about the threat before trial we would have to believe that the threat, made in late November 2008,[2] was never mentioned by Sneed to Stallworth at any time before September 21, 2009. We find that to be implausible in the extreme.

Assuming that Sneed did not inform Stallworth that he had been threatened with retaliation if he testified, the inference we would draw from that is that there had been no such threat. This would explain why the first mention of it appears in the civil complaint filed on November 28, 2011, more than two years after Stallworth's conviction. But we will assume arguendo that the threat was made

---

[2] See Def.'s Mot., Ex. 7, Sneed Compl. ¶¶ 20-22.

and that Stallworth knew nothing of it until he received a copy of the civil complaint. What is the legal significance of the threat? If the threat is to qualify as newly-discovered evidence, it must be material. Perhaps it would be a circumstance tending to show that Eaves in fact knew of Sneed's and Stallworth's joint effort to investigate Vargas and would be material in that sense. It would also show why Sneed was refusing to testify (despite being listed as Stallworth's No. 1 witness), if in fact he was refusing to testify. The government argues that the reason Stallworth did not call Sneed to testify is that Sneed had nothing to say that would benefit Stallworth and likely could only have hurt him. (Gov't's Resp. to Def.'s Mot. at 12, 13-15.)

The court was told nothing about why Sneed was not called to testify, and this brings us to the question of diligence. Stallworth implies in his motion that he asked Sneed to testify but Sneed refused to do so, giving no reason for his refusal. Yet Stallworth made no effort to enlist the assistance of the court in compelling Sneed's testimony. A threat by Eaves that Sneed would be discharged or suspended if he testified would constitute no legal excuse for refusing to testify. We would have ordered Sneed to testify and would have held him in contempt if he refused. As far as Eaves was concerned, the alleged threat, if it occurred, would have been a violation of 18 U.S.C. § 1512(b)(1) and (2)(A), which provides for imprisonment up to twenty years for anyone who

threatens another person with intent to prevent that person from testifying in an official proceeding. We doubt that, had Sneed testified under court order, Eaves would have considered retaliating against him.

If Stallworth was, as he implies, ignorant of Sneed's reason for refusing to testify, he had only to request the assistance of the court to find out what it was. If the reason was the threat by Eaves, Sneed would have told us that when we required him to state the basis of his refusal. Stallworth would thereby have discovered the threat.

The defendant used no diligence whatever to obtain the testimony of Sneed or to learn why Sneed was refusing to testify (if he was refusing). Because of this lack of diligence, the defendant is not entitled to a new trial based on "newly-discovered" evidence.

There is another reason Stallworth's motion fails. Relief on the basis of newly-discovered evidence also requires that if the evidence were presented at a new trial it "would probably result in acquittal." Reyes, 542 F.3d at 595. Testimony by Sneed that he and Stallworth had been working together on a sting operation directed at Vargas, that Stallworth's two-page addition had been clipped to Sneed's initial report on or shortly after the events of August 11, 2008, and that Eaves had threatened Sneed with dismissal or suspension if he testified to that effect, would not have been

credible and therefore would not have had a possibility of resulting in an acquittal.

The government suggests a number of reasons why the activities of Stallworth on August 11, 2008, had none of the earmarks of a sting, Gov't's Resp. at 13, and why the two-page addition gave every indication of being a false alteration of Sneed's report, Gov't's Resp. at 7-8. We agree with the government's arguments. The two pages were added after the FBI interview in November in a clumsy effort to make it appear that Stallworth had reported the DuPage Airport affair the day it happened.

Stallworth's failure to mention the sting to the FBI agents when they interviewed him in November is highly incriminating. Had the airport incident been a sting, documented in a contemporaneous report on file at the police department, the natural thing for him to have done would have been to explain that to the agents. They could have gone to the police department immediately and examined the report. Instead, Stallworth made no mention of a sting and admitted that he had "screwed up."

Also incriminating is the way Stallworth handled the ten $100 bills he received from Vargas. Stallworth stated in his report that he placed these bills in his personal safe at the Police Department. What Stallworth didn't know is that the FBI had made photocopies of the ten bills. Not a single one of the bills in the safe was identical to what Stallworth had received from Vargas. No

explanation for this was offered at the trial, but in support of his present motion Stallworth gives the following account in his reply:

> 62. After, the unknown subject left the area Carlos had Stallworth drop him off at the front of the Target store, and paid Stallworth, $1000. all in $100. bills.
>
> 63. Once Stallworth, received the $1000. from Carlos, he placed the money with his money in his pocket, which Stallworth had about $3,000. to $4,000. all in $100. Bills as flash money.
>
> ...
>
> 66. Once Stallworth got off work from Metra, he reported directly to work at the Harvey Police Department, and placed what Stallworth believed to be the $1000. that Carlos paid him in regards to the security detail, inside the safe under his desk, until HIDTA made contact with Sneed in regards to the information report he faxed to them in May 2008, because Stallworth knew he could not keep the money, because it was part of the case against Carlos Vargas.

(Def.'s Reply at 12A.) This story is absurd on its face. Stallworth would have had no reason to be carrying $3000 to $4000 in $100 bills "as flash money" to the DuPage County Airport to provide security for Vargas. But even more inexplicable is how an experienced police officer could possibly mistake any of the ten bills he had received from Vargas for any other money he was carrying.

Our conclusion is that the allegedly newly-discovered evidence that Eaves had threatened Sneed, if presented at a new trial along with all of the overwhelming evidence of Stallworth's guilt, would have no probability of resulting in an acquittal.

In addition to newly-discovered evidence, the defendant asserts additional grounds for his motion that are all based on the argument that Sneed's civil complaint establishes that Acting Chief Denard Eaves threatened Sneed with retaliation if he testified for Stallworth and for that reason Sneed did not appear at trial. On this premise, Stallworth argues that his right to due process was violated because "the government knew or should have known" that Eaves's testimony denying any knowledge of Stallworth's participation in an investigation of Vargas was false. Stallworth also faults the government for failing to interview Sneed to determine what he knew of Stallworth's participation in the investigations. The defendant also asserts that he is actually innocent of the crime, again, based on Sneed's allegation of the threat by Eaves. Finally, the defendant contends that he is entitled to a "public authority" defense in that his dealings with Vargas were authorized by his superiors as part of an official police investigation.

The only witness who might support any of these additional grounds for a new trial is, of course, Sneed. We have indicated our finding that his testimony would not result in an acquittal, which means that a jury would not find his testimony to be credible. As far as the alleged failure of the government to interview him in advance of trial is concerned, the government had no such duty. In any event, the government did attempt to

interview him and met with his refusal.  The defendant and his counsel were aware of this at the time of trial, due to the government's letter asking whether defense counsel represented Sneed as well as Stallworth.

Stallworth's claim that government counsel were aware of perjury by Eaves and other Harvey witnesses depends entirely upon the credibility of Sneed's claim that he was threatened by Eaves. The same is true of the claim of actual innocence.

It happens that in affirming Stallworth's conviction, the Court of Appeals dealt with the issue of public authority:

> Related to Stallworth's entrapment theory is his argument that he was not engaged in a criminal transaction at all, but instead that he himself was running a sting operation designed to bust Vargas.  In essence, he is raising the defense of public authority or entrapment by estoppel. The two defenses are similar.  Both require that a government official affirmatively communicate to the defendant that he is authorized to engage in certain conduct without incurring criminal liability.  The conceptual difference is that with the public authority defense the defendant engages in conduct that the defendant knows to be otherwise illegal but that has been authorized by the government, whereas with entrapment by estoppel the defendant, relying on the government's statements, believes that his conduct is not prohibited.
>
> ...
>
> For what it is worth, Stallworth's claim looks to us like a public authority defense. He was engaged in what he knew to be an illegal drug transaction, but he did so (he says) for law enforcement purposes that should insulate him from liability. <u>But he forgets that under either the public authority defense or entrapment by estoppel, someone in the government would have had to authorize his actions.  Here, there was no one, and so it makes no difference whether this nonexistent person had actual or</u>

- 12 -

<u>apparent authority. Stallworth thus had no right to present either defense to the jury.</u>

656 F.3d at 726-27 (citations omitted)(emphasis added).

## **CONCLUSION**

Stallworth asks that we conduct an evidentiary hearing on his motion. Nothing would be learned in an evidentiary hearing that we have not been able to determine from the written materials the parties have presented.

The defendant's motion for a new trial [182] based on newly-discovered evidence and various other grounds is denied. The defendant's request for an evidentiary hearing is also denied.

DATE: October 31, 2012

ENTER: _____
John F. Grady, United States District Judge